Kathleen Sullivan for Samsung. I'd like to begin with the reasons why this Court should reverse or vacate the award to Apple of $399 million for design patent infringement. And I'd like to remind the Court at the outset that what is at stake here was an award of $115,000 for infringement of three design patents, each of which involved only a very narrow slice of the iPhone. Now, to begin with why the infringement liability finding was in error, both for reasons of instructional error and because we think no properly instructed jury could have found design patent infringement, the key point here is that there was a failure in this case to factor out functional from ornamental elements. I appreciate that. And that may be a process question, but it seems to me there is a distinction perhaps between getting that ferreted out in the context of claim construction or ferreting it out as you suggest in your case because you're appealing to the jury instruction, not the claim construction issue. So is that not an important distinction? I mean, you rely on Ozon and Richardson, and I appreciate your reliance on those cases, but those all spoke to claim construction, not to kind of a jury instruction at which point you ferret out the functional. Your Honor, with respect, we appeal both. We believe there was legal error both with respect to claim construction and with respect to the jury instruction. If I could remind Your Honor of what happened, we thought multiple times to get functional from ornamental, which we think is the key issue in design patents, as this court has said repeatedly. We were denied an early claim construction, and we came back later and we said we'd like that claim construction that you postponed. In appendix 43-775, the district court declined then to give us a claim construction factoring out functional from ornamental. After, Your Honor, we've said much of the trial eliciting from Apple's witnesses evidence, admitted evidence, of the functionality of multiple elements. Because you were also arguing that the patent was invalid because it was functional. Isn't that the cleanest way to deal with the fact of functionality? No, Your Honor. If I could, this is another procedural distinction. We're not appealing the denial of JML1 invalidity. We think at the invalidity stage, this court's precedence made clear that validity will be presumed and will only be disturbed if everything about the product is dictated by function. We're not appealing that here. And as Your Honor said in PHG, maybe at the validity stage, it's important to look at whether dictated by function has been met. But we think when you put together Adzan, Egyptian goddess, and Richardson after Egyptian goddess, it's absolutely clear that there must be some distinction between the functional and ornamental elements, whether it's through claim construction or through a jury instruction. In Egyptian goddess, this court said the duty is to distinguish functional from ornamental. There's a duty. We just give the court discretion how to fulfill that duty. Here, the district court didn't give a, it didn't fulfill that duty either way. The district court declined the claim construction at 43-775. We built our entire trial around trying to get there. And then, crucially, at 43-918, she denied our instruction asking for the fourth time that she distinguish functional from ornamental. So Your Honor, to answer your question. Well, isn't it clear that she did instruct the jury that it has to be ornamental? And she repeatedly said only the ornamental design is protected. Your Honor, with respect, that's not correct with respect to the infringement instruction. If you look at the infringement instruction as given, the infringement instruction at 44022-23, as she reads it in the transcript, instructs the jury to compare the overall appearance of the Samsung and Apple design. Now, Your Honor, crucially, what's missing there is the word ornamental. You're right that earlier in the invalidity instruction, she referred to the term ornamental. But the invalidity instruction can't cure the problem with the invalidity instruction. Number 52 was wrong anyway. We're not appealing it. But it said that shape and configuration can be protected, which they obviously cannot. What should have been instructed, and Your Honor, we're not saying there should have been exact magic words. We gave her multiple choices. We said, please define the difference between functional and ornamental. We said, please district court, take out at least these few things which Apple has admitted are functional. Rectangular nest, rounded corner nest, flat screen nest, clear cover over an underlying rectangular display. There were admissions as to the functionality of those elements. And whether, as Egyptian goddess says, the district court has discretion how to distinguish functional from ornamental, but it does not have discretion whether to distinguish functional from ornamental in a case like this, where obviously both are involved and in which obviously purchases and consumer demand were driven largely by non-ornamental features, a topic we've already visited twice now in the context of the injunction appeal. What do we do with all the case law that says you're supposed to look at the overall design, and you're not supposed to just take ornamental features in isolation? Your Honor, what you do is you say overall ornamental appearance. Overall ornamental appearance. The crucial problem here is that the jury was not instructed to, nor was there any claim of instruction limiting it to, comparing the overall ornamental appearance. Let me be clear, are you saying that somehow just because the discussion of the ornamental aspect was in the invalidity section of the jury instructions that we're not supposed to look at the instructions as a whole? We are, Your Honor. We absolutely think that the invalidity instruction cannot sort the problem of the infringement instruction, because this court has made clear that at the infringement stage and the invalidity stage, the inquiry is different. At the infringement stage, what has to be done is a comparison between the accused product and the claim's design. We're not deciding now whether the claim design should have any presumptive validity. We're deciding now whether there's infringement. And you've been quite clear, and there's two errors in the instructions, of course. First, there's the failure to require that overall appearance be viewed in light of only the ornamental features, with the functional features factored out. There's also the failure separate, which compounds it, of failing to instruct the jury they must take prior art into account. So, Your Honor, no, the invalidity instructions, which weren't correct anyway and are not on appeal, can't cure the problem of the infringement instruction. Remember Richardson, this court, it did say you have to be very sensitive to functional elements or functionality in a design patent infringement context. But then, when it actually did the design patent infringement analysis, I didn't see any filtering out, which is what you seem to be suggesting that they do. They, instead, just seemed to look at this, I don't know, this kind of caveman-looking tool that's protected by the design patent and compared it to the accused device, which was a much more I didn't say, well, now we are going to look at this design patent and take it out and factor out and filter out those pieces that we, today, are deeming functional. I didn't quite see that. Your Honor, with respect, this court said exactly that, and I can read to you from page 1296 of the opinion. Ignoring the functional elements of the tool, the two designs are indeed different. Ignoring the functional elements of the tool. And there's no surprise in that, because you had said earlier in Egyptian Goddess that there's a duty to separate them. It can be done through claim construction. Egyptian Goddess was clear that you didn't have to do a certain kind of verbal description. But we are saying that the judge here was obligated to separate functional from ornamental in some way or another. Your Honor, in Richardson, though, I didn't quite see what, if anything, actually got filtered out. Oh, Your Honor, what got filtered out was the step claw versus the foobar. And they were a combined hammer and step claw and crowbar. And what got filtered out were the functional elements of the hammer, the claw, and the step. Sorry, the step claw, the hammer, the step device, and the crowbar aspects. Once you factor out the functional elements, which are the hammerness, the clawness, and the crowbarness, then what matters are the fine differences, which the court, this is, of course, a bench decision, not a jury decision. We've submitted all the more important than the finder of fact is the differences only in the ornamental features that remain. Obviously, we're in the hypothetical ordinary observer test that we have from Gorham and Egyptian Goddess. But in the hypothetical exercise, what the court did exactly, Your Honor, was in its mind's eye, filter out the functional elements, ignore the functional elements, that's the exact language, and says, well, there's a hammer, but one is tapered. There are elements that are more rounded. Others are more sharp. And that's exactly what we're saying here, Your Honor. If the jury had been properly instructed, and we submit that it would have to reach this result, it would filter out the things that Apple conceded in the course of the trial, Apple's witnesses conceded were functional or structural. The rectangular shape, the large display screen, the location of a speaker slot near the top, the grid of colorful icons with respect to the D305. If you filter out all those functional elements, then what would remain would be the differences in the  Let's talk about the fact that in jury instruction number 43, where the court actually described what the patents cover. In each instance, she said the patents cover the ornamental design. She did not imply that the patents covered anything other than just the ornamental design. Yes, Your Honor. We think that's completely inadequate and misleading, without any attempt to define the difference between ornamental and functional. She had to be able to say that ornamental and functional are distinct. Functional is not protected. And the mere recitation of the pure ornamental in a description is not the equivalent of an instruction to factor out. So we don't think 43 can cure the problem. But Your Honor, let me use a simple analogy. This all started with a carpet back with the Congress of 1887 overruling the Dodson case. Let's imagine that there's a patented design for a Well, someone can't come along and say, oh, I'm going to apply that to a plush carpet. You would say to the jury, if the same design is on a plush carpet, the plush one is easier on the feet and it doesn't flip. The flat one is easier to transport. Those are functional differences. If the design is the same, there's infringement. Our case is the very opposite. In our case, if you put the patented designs, which remember are very narrow, it's a portion of the front face of an iPhone with clear glass to the edges. It's a portion of the front face of an iPhone with a metallic bezel. It's just the colorful grid of icons in the user interface. They're very narrow. They're just a slice of iPhones, which have tons of other design patents as well as other utility patents built in. Our case is the opposite. Our case is where you've got two flat rugs. They've got the same functionality. They've got the same rectangular shapes and flat, clear display and rounded corners. Once you factor out those similar functional elements, our submission is, a reasonable jury would have to believe that the ordinary observer would see all the profound ornamental differences between the two. Apple created an iPhone that's beautiful, that's changed the world. We don't contest that, but its beauty consisted of its minimalism, of its flat, oily comp, of its lack of busyness and ornamentation. When you put it next to any of our phones, and with respect to all of the Accused products, these differences are the same. We have buttons on the bottom front. We have circular holes on the top. We have differently shaped and placed speaker slots. They have different shapes and they're higher up into the corner. The confusing thing for me is when we're talking about the design elements here, the design patents, there's ornamentation and function going on here. Exactly right. And for design patents, we're looking at whether the design is dictated by function. Only for validity, Your Honor. Only for validity. But we're trying to figure out exactly what do you mean when you say, filter out the functional parts. Do you mean filter out the elements that are dictated by function? That their appearance is dictated by function? Or anything that could be regarded as utility or utilitarian. Yes, Your Honor. That seems kind of extreme. So, what do you mean? Your Honor, we believe the proper test is functional, primarily functional, significantly functional. But we think we win at any standard of functionality here. Because Apple's own witnesses conceded in the course of the trial that certain features were, in a sense, dictated by function. Apple's witnesses conceded that, for example, a clear cover over the display is, quote, absolutely functional. So, Your Honor, we don't think you've clearly resolved it. Well, then you would have won validity if Apple's witnesses conceded all of it. No, Your Honor. Please let me distinguish two things, because I think your cases have. At the validity stage, we presume the patent is valid, and only if every aspect of it is dictated by function. So that there's no ornamental elements. Do we deny validity? Now we're in the infringement stage. You've said over and over again that we've come a long way from silver spoon handles. And in the world of a complex, multi-component, high-tech product like the one we're talking about here, we're certainly in the realm of many, many, many different aspects of ornamentation and functionality that are going on. And you've said in the Gypsum Goddess, when there are both ornamental and functional elements, there needs to be some distinction between the two. And that's really constitutionally compelled. You have to read the statute to filter out the unprotected elements, or else you'd be finding infringement for a part of the device that is not entitled to a monopoly for a limited term. So we think our interpretation of the statute, Your Honor, we think we prevail here. And you, at a minimum, have to send it back for a retrial based on the erroneous instruction, whether functionality is significantly functional, primarily functional, or solely functional. Because as to the elements I've just enumerated, rectangular shape, large display screen, clear cover over the display, speaker opening near the top, or grid of colorful icons, Apple either admitted that those are unprotectable, because structural and part of the common storehouse of knowledge of man, or because they were functional or absolutely functional. So, Your Honor, we don't think to remand you need to decide for the elements whether functionality has to be primary, significantly, or solely dictated by function. And I think that Richardson shows you an example, post-Egyptian goddess, of elements that were both ornamental and functional. I don't see any ornamentation in that one. There was, Your Honor, the ornamentation, the design patent was not invalidated there. It was simply a finding of non-infringement. And the reason was that the foobar and the stepclaw, one was more angular, one was more rounded, and there were other ornamental differences in their appearances. And so, Your Honor, that wasn't a case of invalidation. But just to go, I want to be very clear in answer to Judge O'Malley's question, we're not insisting on an element by element analysis. We can see that you said overall appearance. We just insist that you also said overall ornamental appearance, and that what needs to be looked at is the rug design, not the thickness of the carpet, or in our case, the ornamental elements. The ornamental elements are quite different. Putting anything on the face of a minimalist design... Well, I thought we talked before that the judge clearly in the instructions referred to the ornamental stuff. The judge used those words, ornamental. You're saying you need more. Absolutely, Your Honor. Simply to use the word ornamental didn't give the jury any guidance. It didn't say ornamental is contradistinguished from functional. It didn't say look only at ornamental. It didn't define ornamental. And we're not saying that there's a particular set of magic words involved. We accept that you have said that the judge can do this many different ways. We just would argue respectfully to you that here the district court didn't try any method of enlightening the jury on the difference between ornamental and functional. Well, we're talking about functional just because the clock is running. So unless you have another quick point you want to make on designs, I was going to move to trade drafts and functionality in that context. Very happy, Your Honor, as long as we come back to design patent damages. No, go ahead. Which would you prefer to take first, Your Honor? Do the damages briefly. Let's do damages because I think it's related to liability. Remember under Section 289, Apple was awarded Samsung's total profits, total profits for all these phones. Even though that, I use this word respectfully, is absurd. It's like ordering the entire profits on the car because of the patented design of the cup holder, to come back to an analogy we talked about back in the United States. Yeah, but the problem may be for you that that's not the level of our review. It's what the statute says. I mean, it's a question of who gets to change it. It's in fact, even if you're right, and it is absurd in your view. Well, Your Honor, with respect, we don't think that the statute straightjackets you in that way. We think there are absurd results here. The amici in support of Samsung lay them out in detail. There is a multiple recovery problem. Take the car example. If you have a patented cup holder, they're going to get the entire profits. And then the patented tail fin folks are going to come in and they're going to get the entire profits. And then the patented rear view window folks are going to come in and get 100% of the profits on their design. That problem is so absurd that you shouldn't construe the statute to require it. And we would focus first on the statutory language. Well, let's go back to 1887. All right, Your Honor. Are you saying that – what did you think – how do we understand 1887? I think 1887, the other side would say, should be read and understood in a directly opposite way of what you're contending the current 289 means. They would, Your Honor. We would say – And do you agree with that? We disagree strenuously. We think that nothing in the language enacted in 1887 bars limiting profits to the profits attributable to an article of manufacture smaller than the entire product that's sold. What was the whole point of 1887? To overrule Dobson as to apportionment. Remember, Dobson gives only nominal damages for design patent infringement and denies apportionment. The two things that didn't happen is, first, the court didn't say article of manufacture is always the entire product sold. And second – sorry, Congress didn't say the article of manufacture is always the entire product sold. It said, find the article of manufacture to which the design is applied. And then it said a very important additional thing, Your Honor, and we'd focus on this language in the statute. It said you can have up to the extent of total profits, up to the extent of total profits. Both article of manufacture – article of manufacture plainly can be construed as less than the entire product that's sold. It doesn't say up to the extent. It says to the extent. To the extent, Your Honor. So let me be precise. It says to the extent of his total profits. But the key, Your Honor, is to the extent of. So it suggests that total profit is a ceiling and not an absolute floor. And the second thing here is that article of manufacture is not defined as a product. What does that language, to the extent, get rejected into the statute? I can't answer that, Your Honor, but it's certainly part of the 1887 revision. What's in the 1887 Act, then? Well, Your Honor, it's in the Act now. Let's go back to 1887 for a minute. Two things happened then. The statute defined article of manufacture, but it didn't say entire product. And the second thing that happened is it didn't abrogate causation principles that were part of the common law. It's well settled that we attribute to Congress knowledge of the common law at the time, Cary v. Pipus. Congress knew about, or it must be construed to have known about, ordinary causation principles. This Court has said over and over again that patent infringement is a species of tort. And tort requires causation. You've required causation in every other element of your jurisprudence. Is it wrong to understand Dobson in carrying forward the causation principles from Garrison into design patent land and then Congress overruling that with respect to design patents in 1887? Correct, Your Honor, because what the statute rejected from Dobson was apportionment. It did not reject causation. And they were different. I know I'm going to hear my friend get up and say causation, apportionment, it's all the same. Different tests, different burdens. Causation is the inquiry about whether the sale or the profit occurred because of the infringement. It's antecedent to an inquiry whether if causation is proved and harm is shown, we later subdivide the profits according to some kind of equitable principle or apportionment principle. Different burdens. And we will get to trade risks and I don't want to hang on this. If I could just say this, if you have any doubt about whether you can construe the statute to eliminate this total profit absurdity for a complex, multi-component, high-tech product, if you have any doubt, if you think that you can't bring the rationality to design patent jurisprudence that this court has worked so hard to bring to injunctions and to utility patent damages, then I respectfully suggest you go back and you look again at my liability argument. It can't be that they can come in and say overall appearance is a big gestalt, just look at whether they look alike, don't factor out the functional differences, and then get total profit. That can't be. So if you think you're constrained on the damages, we respectfully request that you at a minimum send it back to new trial on liability. But Your Honor, you wanted to move to trade risks and I don't want to use that. Sure, well since we were talking about functionality, obviously that has bearing on trade risks. Do you think there's even less of a requirement of functionality in terms of how much it bears on the entire product in the trade risk area than in the design patent area? Your Honor, I think there's overlap between the functionality analysis in the trade risk side of our case and the design patent side. I think that the failure to factor out functional features is a problem on the trade risk side as well as on the design patent side. But on the trade risk side, you're not objecting to any of the jury instructions. That's correct, Your Honor. I'm just saying you don't think the jury did it. Your Honor, we think that the evidence is insufficient as a matter of law to show that there was trade risk dilution. And I'll say a brief word about that, but our second key point is to have monetary damages for trade risk dilution under the statute. There must be willfulness. There was no willfulness on this record. Maybe I can start with that point and then go back to liability. Let me ask you something though. We've got registered trade risk and unregistered trade risk. And other than the issue of the presumption, the parties really never differentiate between the two. And I looked through all your briefings below and the most I could find was a footnote in your game all having to do with the starting point. That's right, Your Honor. For purposes of remand, all that matters about the difference between the two is that the unregistered trade grants was held by the lower court not to require a notice date. And therefore, the court declined to retry damages for the six products found to infringe design patent and the trade grant because she said, it doesn't matter whether it was design patent or trade risk because unregistered trade risk doesn't need notice date. If you were to reverse on unregistered trade risk, then the notice date problem would re-arise. Okay, so that's a remand question with the detail. Let me go to the core point. Your Honor, I wonder if we'll have any chance to go over time. Well, why don't we just keep going. I can still ask one more question. You say in your blue brief that all of the trade risk damages are attributable to unregistered trade risk. And I just don't see where you get that. Oh, no, Your Honor. That's really a question about remedy on remand. Well, you do say that. So, Your Honor, Apple does not want, we can't separate the registered from the unregistered trade risk. Can or can't? Cannot, cannot. So, let me try to explain why the willfulness issue is so important. The willfulness issue is so important because it covers both. And let's go back and remind ourselves what is the trade risk here. And if I leave you with nothing else today, I want to remind you that this is not a case about the Apple brand. It's not a case about the Apple logo. It's not a case about iPhone. It's not a case about the iconic features of the phone, like the home button. Those are not the trade risks that are at issue here. And, Your Honor, if you want to go to the record and look at them, you'll see that the unregistered trade risk, which was invented for this litigation, and it reads on elements that are not in the Samsung phones by design. So, it doesn't say that the home button is claimed. Obviously, if it claims the home button, we couldn't dilute because we don't have a home button. The unregistered trade risk is a set of very particularized physical features, not including the most famous things, the Apple logo on the back, the home button on the front. The registered trade risk is similarly exceedingly narrow. It's a rectangular handheld mobile digital electronic device with rounded silver edges, a black face, and a list of 16 icons. And then there's a very specific list of the 16 icons. Your Honor, And then it shows the picture, too, at the front of the phone. It does, Your Honor, but we think you have to read the picture as defined in the written specifications, which don't include the home button. That's at A1330. But, Your Honor, the real point I'm trying to make here is let's take a step back, and ask what the trade risk dilution statute is about. It's an extraordinary statute. It's about, typically, in a paradigm case, taking a brand, a famous brand, a brand so famous that everybody in America knows it as a brand, and diluting its reputational capital by applying it to a non-competing product. In the legislative history, the examples were things like Buick shoes, or if we were to think about it today, something like Coca-Cola motor oil. This is not that case. This is a case between competitors. And the IP Lund decision out of the First Circuit, which we cited, reminds us that when we're talking about product configuration trade risks in a case between competitors, we're at the outer limits of the statute. We're treading very close to a world where competition should be allowed. Could you ask the court for, and I haven't seen it in the record, but I'm assuming you didn't, but you didn't ask the court for an instruction about the specific applicability of these principles to product configuration trade risks. I can't answer that off the top of my head, Your Honor, but I'll come back to you in rebuttal if I can locate it. But, Your Honor, the real principle here is it's a matter of law. You're in that phase with the need to construe a statute, and to construe a statute in light of constitutional principles. And the only way to avoid a serious constitutional question about whether Apple is going to get through the trade dress statute. But you didn't make a constitutional argument below, did you? We did, Your Honor. We made it in the Jamal proceedings. In one sentence? Well, Your Honor, generally, you said there may be constitutional concerns if you don't get rid of it. Your Honor, with respect, we think that constitutional avoidance is something that you should think about as part of your legal analysis here. Your Honor, willfulness here, I just want to remind us that we're not just talking about beauty and function now, as we were for design patents. We're in the trademark statute, and what we're talking about now is designation of source. The only reason to protect trade dress from dilution is that you're diluting its source-identifying qualities. You're making people less likely to associate the product with the brand with which it's associated. Now, even indulging the heroic assumption that these narrow trade dresses connote an Apple brand, even without all the iconic Apple features, there was no showing that Samsung willfully tried to trade on that source recognition. No evidence that there was an effort to trade on recognition of claimed dresses. And the reason that's so clear, don't take it from me, take it from the district court. Apple comes in after the case, and it asks for attorney's fees only based on trade dress dilution, and they are denied because the district court holds, and this is at A9222, Samsung might have reasonably thought that its proposed usage was not barred by the statute. Now, that's a very obvious holding, because there are serious questions here about fame. These weren't the famous trade dresses. There was no proof of fame. That's because that was a district court question, and she was able to look at the evidence on her own and balance it. She doesn't say, and no reasonable person could have concluded the contrary. You're correct. She was giving you a break there. Well, we think that there may have been some remorse about letting the entire case go on this very weak trade dress claim that's so far from the paradigm case. But, Your Honor, we would respectfully suggest that willfulness does not change description, whether it's being used to decide whether to enhance damages for utility patent infringement, or whether it's being used to decide whether to give attorney's fees for trademark infringement. And the reason is, you relied on general principles of willfulness in cases like Seagate, where you went to general principles of willfulness, and in every related context involving other federal statutes, like in Safeco v. Burr, the court has held, and this court has held, that a reasonable defense defeats the showing of willfulness. Now, here we don't even think that Apple starts with any subject of showing of willfulness. There was never a showing in this case that Samsung knew of the registered trade dress, and there was certainly never a showing that it knew of the unregistered trade dress that was made up for this litigation. So there's no subjective knowledge. But there's also no reason, there's no objective basis for a reasonableness, for a willfulness finding here, because there are reasonable defenses. So, Your Honor, we respectfully... You said that you wanted the court to add to the willfulness instruction for trade dress. Even if you don't agree with us that there's insufficient evidence of willfulness, and you should throw out a $302 million trade dress award, we think at a minimum you should remand for a new trial on trade dress, because we did ask for the exact language of the statute to be given. The instructional error is what you can find in our proposal at A7090, and that's our proposal instruction number 61.1. We wanted her to give the statute that willfulness requires that we intended to trade on recognition of the trade dress. And not only did the district court not give that statutory definition, the district court also created the potential for misleadingness and confusion because the court did give a definition of willfulness for patent infringement, but in that instruction it said, oh, willfulness can mean reckless. So not only do we not get the specific intent version of the willfulness instruction we should have gotten as a matter of law, we have the jury thinking maybe recklessness is enough, and we don't even have anything about source recognition. And that's really the key point with trade dress, Your Honor. If I could just come back to the... Briefly, because we're out of time. I'm sorry. Just take another minute to conclude.  And I would ask Your Honors to focus in particular on the absence of evidence of fame. Now, I know that sounds funny because you just think intuitively, well, iPhone's very famous. But the trade dresses here are not iPhone. They're not Apple. They're not Apple logo. They're not Apple brand. They're these funny little particularized trade dresses that were concocted so they wouldn't read on Samson's phone. The lack of evidence of fame, the evidence of functionality, even out of Apple's own witnesses, and the lack of evidence above all of dilution. If I focus you on nothing else on the liability case, please pay attention to Apple's dilution expert, Mr. Weiner, who admitted at A41538 that he had no evidence to show that Samson's actions have diluted Apple's brand. That's a quote. And he also admitted in response to questioning that he had no evidence that Apple had lost any market share as a result of dilution. This is such a weak dilution case. We think you should revert on either liability or damages. And then we can talk about whether you're sending anything back. And if you send it back, we respectfully submit that any new trial must allow us to show our evidence of independent development. We weren't allowed to show that we developed smartphones with flat faces before the iPhone was released. And if you look at nothing else about that point, look at our gray brief and compare page 41 of the gray brief, which shows what Apple was allowed to show, a bunch of pre-iPhone Samson phones that look like they're kind of funny and they have little antennas and don't look like an iPhone at all. Apple was able to bring that in and say, see, they copy, copy, copy. We had to go into this case with one hand tied behind our back because we couldn't put in evidence from Ms. Park that would have allowed us to show what you can see in gray brief 43, which is beautiful phones that we created before the iPhone came out. So if you send it back for a new trial, we respectfully request that as well. Thank you for not taking the second time around. We'll restore four minutes of rebuttal, which means we're just short of nine minutes ahead for what Ms. Sullivan will get. So why don't we add nine minutes to your time. Hopefully you will not need them. But that's more up to us perhaps than it is up to you. I'm hoping and I will try. May it please the court, my name is Bill Lane. Together with my partner, Lauren Fletcher, we represent Apple. By my count, there were about 25 issues before the court. Approximately five of them or so, if you include the constitutional argument, are matters of law or matters for the court, if you include the 163 patent indefiniteness argument. The remaining 20 or so are substantial evidence or abuse of discretion questions. All of the trade dress questions, save for the instruction questions we'll come to, are substantial evidence questions. The last issue that was addressed about proving their independent development story was an abuse of discretion standard. And I'll come back to that because I would like you to focus on Ms. Sullivan's reply brief. Because there, they say to you that the district court repeatedly said that they could use the F700 as evidence to rebut copying. There are two citations by SAMHSA. And I think the citations speak volumes. One is A66785. And when you look at that, what you'll find is the district court is allowing them to use some private to rebut copying. Most of it's not SAMHSA in prior. And none of it has to do with the F700. Well, let me answer this. When the trial court excluded this, as I recall, the trial court said, all right, the magistrate judge had excluded it from the design patent analysis and left open the question of whether it could otherwise come in. And then ultimately, at least it sounded like she was exercising her discretion under Rule 403 to say it shouldn't come in at all because it will be unduly prejudicial across the board. So if, theoretically, we were to send back only a portion of the case that didn't include the design patent, wouldn't that allow at least the trial court to reweigh that question and reweigh the question of whether or not the sanction should include reference to that in the trademark? If there were ever a retrial, I hope there's not. She would always have an opportunity to reconsider it. But there are actually some additional facts in the chronology outline, and I don't want to spend a lot of my time on this because it's an abuse of discretion issue, but I think it actually tells you a lot when SAMHSA comes in and calls our claims absurd or there's no evidence of willfulness. This is what the trial court was dealing with, and she dealt with it very effectively, in my view. The magistrate judge excluded this evidence as a sanction for failure to disclose. SAMHSA sought reconsideration from him and from her three times. The fourth time was on the day of the opening where they offered slides, which were specifically what had been excluded. She excluded it again, telling them they'd come back four times. While the jury was being selected, SAMHSA went back and posted those slides on the Internet with a press release that said the jury ought to know about these. By the time the jury was entangled, those slides were on the Internet. SAMHSA didn't give up. They raised the issue again, and that's actually, I think, what Your Honor was referring to when she went to the 403 analysis. And she said, look, I've seen this now five different times. And I said at the outset I was excluding it as a discovery sanction, but now there is a 403 issue because I'm concerned that there is a substantial likelihood that it will mislead the jury. I'm excluding it. Now, their rebuttal to you is, but she told us you could use it for copying, neither of the appendix pages that they refer you to in the reply say that. One of them refers to Friar, it's not the F700. And the second, the second is a reference to their brief. Nothing to the district court said. And in fact, when we got to the second trial and she went back to the issue, she said I excluded this for two reasons. One was a discovery sanction because you never disclosed it, but I'm also concerned that it would be used to mislead the jury. So it was both. Okay. Can you turn to the adequacy of the Wilson instruction? Yes, I will, Your Honor. And there are multiple responses to the arguments that have been made by SAMHSA. So the starting point is let's look at the instructions themselves. And there are a collection of instructions on, let me get back to the red paper. So if I start first with the law of the Ninth Circuit on jury instruction, which is the same as this court's law from DSU and Sync Court. And it's read the instructions as a whole. And read as a whole, do they clearly mislead the jury? So if we start at A1417, which is one of the dilution instructions, you'll see that the court informs jury that dilution means a lessening of the capacity of a famous trade dress to identify distinguished goods or services. At A1419, it says in deciding whether there's been dilution, you should consider a variety of factors, one of which is whether SAMHSA intended to create an association with Apple's trade dress. Then at A1424, it says four damages. Apple has additional burden of proving that SAMHSA acts of dilution were lawful. SAMHSA did not challenge that instruction as incorrect. Their argument to you is that there was something more that was required. And I think from the district court's point of view and from our point of view and I hope from your point of view, it's important to look at what they proposed to her. Because what they proposed to her, which is at, let me get you to exactly the right page. These would be appendix citation. What they proposed to her was an instruction that had exactly what she described. And then what it had is a sentence that said in other words. And it went on and had two portions to the in other words. Here is the problem. The first is the instruction itself is incorrect. Their proposed instruction, which they ignore in their briefing, is incorrect for two reasons. It's at A7090. The first is the burden of proof is wrong. And all of the discussion before the district court, before the charging conference and before the jury was charged was about whether the burden was clear and convincing evidence or a preponderance. Their proposed instruction was wrong for that reason. It was wrong for a second reason. That instruction said that Apple must prove and I quote at A7090. SAMHSA willfully intended to trade on the recognition of Apple's trade risk or intended to harm Apple's reputation. That actually is conflating or combining two distinct concepts. One is dilution by blurring. One is dilution by tarnishment. The second half of their definition had nothing to do with what went to the jury. So we're in a situation where the court's instructions not challenged by them on dilution are correct. She said that it has to be willful. And then their proposed instruction has these two significant aspects. One is wrong on the merits. The second, if you look at it at A7090, the way they begin the phrase they rely upon is in other words. They're restating what willful dilution is. The court charge is 84 pages long. It took two and a half hours to deliver it to the jury. If she was obliged to restate in other words every single thing that one of us had asked her to do, we'd still leave it. Their own proposed instruction, which is the place where the argument should begin, is speech violence. It says in other words, and she was not obligated to give a cumulative instruction. And it was wrong. And that is why the procedural context in which this arose was important. They offered this A7090 instruction. But then there was the charging conference. Then she told us where her proposed instructions were. Now, Samsung says to you, she said that all of your objections are reserved, as she made before. But Samsung said, and we said the same thing because we thought it was correct. Your Honor, we think we need to restate them to preserve them. They didn't restate it. In the very portion of the transcript where they cite to you her statement that what you've done before is preserved, Samsung's lawyer says, we appreciate that, but we don't think that's enough. We're going to restate our objections. There's no objection to this instruction. And that's particularly important when the instruction that you proposed in the first instance was wrong. Now, if you set aside that instruction, question everything else that Ms. Sullivan said to you was either an argument not made below, in the constitutional context, not made to you, or it's a substantial evidence question. Fame, no challenge to the instruction. Delusion, no challenge to the instruction. Functionality, no challenge to the instruction. Each of them is a multi-factor test, some statutory, some case-driven. In each case, there was an overwhelming amount of evidence. And just to take a minute, this idea that there's no evidence of willfulness, this was a situation where the undisputed record showed the following. The iPhone came to market in June of 2007. In September of 2007, Samsung took apart the iPhone, and there was an internal Samsung document that said, intuitive, easy to use, easily imitated, but it's not going to be successful. And for two years, Samsung made phones that we had no complaint about. And significantly, something that Samsung doesn't address, many of those phones were alternative designs. But after two years, their market share, as we show you in our brief, was plummeting, and they had this crisis of design meeting. And in three months, in three months, they came to market with something that was, in our view, identical to the iPhone. Now, when Ms. Sullivan says there's no evidence of willfulness, you have only a portion of Exhibits 44 and Exhibits 57 from the trial record. There are A25366-496 and A26011. Each of these documents was more than 100 pages long. And each of these documents had the iPhone on the left or right, Samsung's current product on the other side. They compared the features famously, and then they copied them. And what happens to market share is right in the brief. It's undisputed. You tend to copy the same thing as you tend to delete the mark, to delete the trademark. It is evidence that's relevant, but there's much more. The documents included in this period, this three-month period, and following, documents that say that our intent is actually to capture iPhone purchasers. And Ms. Sullivan suggested there was no evidence that the trade dress was associated with the iPhone or that Samsung's use of the trade dress was associated with the Samsung phone. It's just wrong. There was a survey from Mr. Poirier that showed that something close to 70% of smartphone purchasers associated the trade dress with Apple. There was another study performed by Dr. Van Lier that demonstrated that 37% of folks associated the Samsung phones with Apple's trade dress. That's why these are substantial evidence questions. And on the constitutional argument, just a second. I'm sorry. I had a question about functionality, but you can do the constitutional argument. The constitutional argument is one sense that says you may have some concerns here. And I'm not sure how the district court would address an argument like that. She didn't address it in part because it wasn't fleshed out or made completely. There was no constitutional concern. It's not indefinite. Your trade dress is protectable only so long as it's distinctive and famous. The fact that it might overlap to some degree with other intellectual property protection, that happens. And the idea that there's a preemption issue, these are competing federal statutes. There's no preemption issue at all. With respect to the functionality question, I'm sorry if I missed it, but have you cited a single Ninth Circuit case in which the Ninth Circuit has found a product configuration designed to be non-functional? To be infringing? To be non-functional.  I don't think so, Your Honor. There's very few trade dress cases in any event. But let me say two things about that. The question on functionality for trade dress purposes is whether the trade dress is essential to the use. It's not too far off dictated by design. Or affect the cost or quality. Or affect the cost or quality. And two things. On the cost or quality, the undisputed proof was the trade dresser actually made the cost higher. And the manufacturing were different. It was the direct opposite of what they... So the design of this user interface doesn't affect the quality of the smart phone? Your Honor, it does. And we're not claiming things have no effect on quality. We're not claiming they don't have any utilitarian benefits. The question you asked, Ms. Sullivan, I think actually captures it. There is a spectrum. At one end of the spectrum are things that might be purely design. On the other end of the spectrum, there is what is essential. Or where design is driven by function. In between, there are designs that have some utilitarian benefits. The cases say that. And in fact, the judge specifically charges during this. There is some utilitarian benefit or use to design. But that's different than functional. Both for trade dress purposes and for design patent issues. I guess what I'm concerned about is that I saw in the briefing and in the record, Samsung identifying all these various elements of your trade dress and pointing out why each one of those elements have some utilitarian advantage to it. And then I didn't see anything in the record or your briefing that rebuts that in terms of are these things something that make the overall phone work better. And what I saw instead was this is beautiful. This is gorgeous. This is very compelling to look at phone. That's all well and good, but that doesn't really complete the analysis on whether, in fact, nevertheless, these various features have the utilitarian advantage to them. Your Honor, three things if I could. If we could agree, the test is not utilitarian. Because many designs, many trade dresses have the utilitarian advantage. As this Court has said, trade dresses and designs are applied to articles of manufacture. By definition, we hope they have some utilitarian advantage. Of course, I don't want to go nearly as far as the fact that it's functional. I'm now trying to understand Ninth Circuit law. Ninth Circuit law looks a little stingy when it comes to trade dress protection through the functional and non-functional standard. They do look at the whole question of to what extent do these various elements improve the performance, quality, maybe even user experience of the article. Your Honor, what they do is they look at a four-factor test. And a four-factor test is the talking ring test. And the second point I was going to make is this is a substantial evidence question. You're confronted with a situation where the jury was correctly charged on functionality. There's no dispute about that. The jury made a decision. The trial judge who sat there confirmed that decision. But here are the four factors that I think will answer your question. Well, the first is advertising. And at page 60 to 61 of our brief, you will see the advertising that tell that trade dress features with no reference to utilitarian benefit. That's what talking ring was talking about. There's one ad with a hand interacting with the user interface, right? Fingers touching the screen. Yes. For sure. For sure. But there's nothing in talking ring that suggests that the mere fact that there's a utilitarian benefit or function disqualifies you from trade dress. And the idea that this is new... So what is the standard? You're not saying that it has to be dictated by function. We're not talking about... It has to be essential. Essential or it has to affect cost. Yes. At that cost. So it's something less than essential. It has to affect cost of manufacturing. It could be either two. I think the best way I can say it is talking ring says you look at advertising, manufacturer, utilitarian advantages. And then I want to come to one because I think it may answer the judge's question. Do you agree with what I think was Judge Rich's original formulation of does this design make the product work better? I actually think that the test is actually a little bit more specific than that today. Because if you just say it that broadly, it may not encompass everything that talking ring has in mind in the Ninth Circuit. One of the keys, and this, I think, goes to Judge O'Malley's question of whether we can show you such another case. One of the keys for trade dress, but also for design practices, were their alternative designs that had the same utilitarian benefits. And this is a key. There were 29 alternative designs, smart phones, that neither infringed the design patents nor infringed, nor diluted the trade dress. There's some Ninth Circuit cases that is quoting the Supreme Court's traffic opinion. It basically says that alternative designs don't really matter if the product design is as functional as it is here in this particular case. I don't think it can be read that broadly. And if you look at talking ring, or even the case of the Samsung site, alternative designs may not be dispositive. I think they could be. They may not be dispositive. But if the question is, is it essential? If I separate the two tests, the essentiality or does it have an effect on cost or quality, on the essential, if you have these alternative designs, how could it be essential? And then the proof here on cost, yes, there was evidence that it improves quality in some respects, but it actually increased cost. It increased difficulty in manufacture. But at the end of the day, I think the key fact is this. This is a question for the jury. No one is challenging Judge Koh's instructions. You have a correctly instructed jury. You have proof going in from both sides. It's not as if we were the only people entitled to offer evidence. From both sides. What Samsung has actually asked you to do on willfulness and fairness functionality is to substitute yourself for Judge Koh and for the jury. But there was substantial evidence, evidence that's very different than any other case that's been decided before. And it's not a coincidence. This court all the time confronts the challenge of applying old legal principles or relatively well-established legal principles to new technologies or new products. Right. But on factor three, whether the design yields utilitarian advantages, when I looked at Judge Koh's opinion, the only thing that she had from that support jury verdict was an executive testimony that this was a very beautiful design. And I don't think that really answers the question of why this design does not yield utilitarian advantages. Your Honor, actually, the testimony went further. It was chosen for its beauty and not for its utilitarian advantages. Well, actually, I'm looking at, maybe we're looking at a different citation. But the citation I have by your witness is that it was created that was beautiful, simple, and easy to use. And it talked about, in that same sentence, they referenced easy to use as one of the things they were touting. That is for sure true. And that's why this essential is important. I mean, the functionality standard is, if the trade rest is supplied to a product, it's not going to be different than a design test. It's going to have some utilitarian benefits. That's why the alternative designs tell you what... You're kind of telling us the reverse. No matter what utilitarian benefit, no matter what the effect on cost or quality, as long as the design part was part of the moving feature, then you're okay on the trade rest. If I'm suggesting that, I apologize. That's not what I'm suggesting. I'm suggesting the following. The test is a collection of factors. It's not just factor three all by itself. It's number one. Number two, I'm suggesting that there was evidence in all four factors. Number three, I'm suggesting that the district court, we agree, correctly charged the jury on all these factors. Now, individually, each of us might weigh them differently, but the jury weighed them and came to a conclusion. And the conclusion was the trade rest was diluted. And the fact they found that for a product which even Hampton conceived was a revolution, yes, this is new territory. But the product was new territory. And that's by definition going to result in new territory. If I could move... I can take the functionality and move it over to the design patent area because it's a place where they overlap. The test is different, but the results should be the same here. And it's for these reasons. The first is... Could you go back and describe what you understand the difference in the functionality test for design patent and the test for functionality in the trade rest? It's... The trade rest one is the one we just... Which one is more demanding than the other? I actually think they're very close. I mean, the difference between dictated by function or essential are very close. They are factual questions. At the end of the day, there was a host of evidence on both. And while, again, any one of us might reach a different conclusion, the jury reached conclusions on this. And the jury actually reached a conclusion on whether design was dictated by function. Can I just interrupt you for one minute on that thought, which is the point that Ms. Sullivan raised several times, which is... And I think she may be right, so tell me why she's not. That the cases you cite, LA GEAR, and all the cases that are cited with respect to dictating function, I'm talking about design patents now, are all validity cases. And in the infringement context, something less than dictating the function is the terminology we've historically used. Is that wrong? Your Honor, the first part's right. The second part's wrong. The first part is the cases we cite were validity cases. There is no case that suggests that functionality is different for infringement and validity. In fact, Your Honor, this is defining the scope of the patents. And this court has, many times, the scope of the patents has to be the same for validity and infringement. So what the court did here, and is that the case in Ms. Sullivan's argument? If you consider what the court did here on design patents, she first charged on the claim construction. And when she charged on the claim construction, she did, as Judge O'Malley said, use the words ornamental design. But she actually did more than that. In the paragraph, immediately two paragraphs before she began to refer to that claim construction as ornamental design, she said, the scope of the claim encompasses the design's visual appearance as a whole. Then she wanted to say, for each of the patents, that it covers the ornamental design. Then when she got to infringement, she said, so she said, it's the visual appearance, it's the ornamental design. And when she got to the instruction number 46, which is at A1394, she said, you compare the overall appearance of the accused's design to the claim design, having given the appropriation of the claim's design. And that's precisely what the jury did. Now, to be sure, when she got to invalidity, she went back to ornamental. But it wasn't the first time. And she said that ornamental means that design is dictated by function. So Ms. Sullivan is saying that our court case law requires more when it comes to instructing the jury on infringement when there are functional elements involved in the trade dress. So just to say something quickly, look at the ornamental, that doesn't quite go far enough, in her view, that you have to also be very sensitive to the functional aspects of any design that has functional aspects. That argument is wrong. It's a matter of procedure and substance. And maybe I'll do the substance first, because it's easier. And if I could give you a quote from Crocs, which is a post-Egyptian goddess case. It's 2010. It's decided in exactly the same year as Richardson, which, while not a jury case. It was a validity case in Crocs, right? Crocs was an infringement case. Crocs was an ITC infringement case, Your Honor. And the comparison was, if you go to Crocs, you'll see the plain Croc against the infringing Croc. And here's the exact quote. And that's what the Egyptian court did here. If you compare her instructions to Egyptian goddess in Crocs, they're almost word for word, following exactly what this court says on file. So Egyptian goddess talks about the overall appearance. Crocs, two years later, says, the test is, quote, similarities in overall design, not similarities of ornamental interest. If I could make two points here, Your Honor. The test they're offering you is exactly the opposite of what you said in Crocs. This is something that's happened again and again in this appeal. When you get to the 289 issue, the panel asked Ms. Sullivan, so what is the standard? What is the causation test? If you ask them to compare what they suppose is the causation test to the Nike opinion, they're the dead opposite. So this is a circumstance where what they propose to you, which is that there was an obligation on the part of the trial court to factor out functional elements. Well, Egyptian goddess on box says there is no obligation. That she had to do it. Isn't there something in Egyptian goddess that says there's an obligation to, I don't know what the right words are, be sensitive to the functional elements? No. No. Actually, Your Honor, and I'm doing this from memory, so your memory may be better than mine, but what happened was this. It said that designs are basically, design patents are basically drawn to diagrams. It's important to instruct on what the claim covers. That's the obligation, is to instruct on what the claim covers. That is done by the graphs or the design. You can do more, but you are not obligated to. If you want to do more, you could consider these things. That was a citation to Adan. But it is in your discretion. And the judge here exercised her discretion in part because she was following Egyptian goddess in Crocs almost literally. But in part, and I would ask the court to consider A7242, because I think it's helpful to look at what Samsung was asking her to filter out. And what Samsung asked her to filter out was a rectangular display screen, a relatively large display screen, and a clear unadorned cover over the display screen. These broad concepts. Well, there were a host of alternative designs that had some aspects of those. The district court rejected that instruction because she felt she had no obligation to filter it out because they provided enough guidance. And then critically important, at A52, she said that was Samsung claims. That was Samsung claims is functional, right? In fact, they all had ornamental benefits, designs, and purposes. And what do we also know? We know the jury was given the same question. Was the design dictated by function? And they said no. So we have... Are you suggesting that if Samsung had, I guess in your view, not gone for the home run instruction and asked for something a little more subtle or limited in terms of consideration of functional elements, that JETCO would have included that? You know, Your Honor, it's hard to speculate in a trial that... In two trials in that month, in which there were 5,800 pages to transcript, there were a variety of other things they could have proposed. But what we do know here is what they did propose. And what we do know is what she didn't do. And we know these things. The instruction that she gave is consistent with Egyptian goddess and cross. Now, Ms. Sullivan says they appealed the correctness of that instruction. I think that you'll search in vain through their briefs to find the argument that she made to you today on the error in the claim construction instruction. The claim construction instruction, they have made no substance mark it was incorrect. So, with the correct claim construction argument, with the correct claim construction, with an instruction to compare the overall appearance of Egyptian goddess and cross to the construction she just gave five minutes ago, with a subsequent instruction that said, for validity purposes, for determining validity, design dictated by function. It's not tenable. And what we have before us now is a circumstance where the jury found the patents were not invalid and it's not appealed. We had the... So, I guess my last question on this is how do you reconcile what happened in Cropps with what happened in Richardson? Well, there are two distinctions, Your Honor. In Cropps, for Richardson, a summary judgment case where the judge decided to do some filtering out the claim construction purposes. Cropps was actually more instructive because there was a trial. Now, it was an IPC trial before the ALJ. The ALJ asked us to try to articulate in words what the diagram showed. And it's about a quarter of a page long in the court's opinion. And what the court said is, no, this is the danger. This is why we said in Egyptian goddess and Cropps that the district court has discretion. Because the ALJ tried to put down in words what's described in the claim by pictures and he got it wrong. The claim is defined by the pictures. Now, Samsung makes this argument that, well, we're trying to collect hundreds of millions of dollars in the basis of lines and shapes. All designs are lines and shapes. That's what designs are. Lines, shapes, squares, triangles. It's the manner in which you put them together that makes them special, unique, and innovative. So I think, I hope I've answered that question. But it is a circumstance where the jury actually considered the issue. We know how they decided it. The trial judge considered the issue. We know how she decided it, A52. And there's no reason for this court to upset it. If I could go to the section 289 issue and damages. So on section 289, let me say these things. One is that the statute says explicitly the total profit. But unlike... It should be said the total profit. Yes. Shouldn't that be read from the ceiling? Should the 250 be the floor? Well, actually, your honor, there's two important points about this. The first is that the district court says you may award lost profits. It doesn't require the judge to award lost profits. And then the second thing is you have to read the statute, a grant against the legislative history and the manner in which this court has construed the legislative history in 19... And I'm not going to go through the adoption cases because the discussion was insolvent. But this is what the committee report said when 289 was adopted. It's at page 3 of the committee report. If I could burn the court just for a minute with a quote because I think it's important. I think it answers your question. This is the committee report that this court cited in 19 as determining what it covered. And here is the quote. It is expedient that the infringer's entire profit on the article should be recoverable. As otherwise, none of his profit can be recovered for it is not a portion of it. It is just that the entire profit of the article should be recoverable by the patentee for it is the design to sell the article. This is Congress' determination. As we know from the amici, some people agree and some people disagree. Is that in the House report or the Senate report? Pardon? Is that in the House report? That's the House report. And that's the House report this court cited in 19 as the most informative report. The Senate report is very close to the same. Just a couple of the points that Ms. Sullivan made on this issue. We think that if you review what 289 says and you look at the adoption cases, you look at the legislative history, the House report, look at the statute, and you look at Nike and you look at the changes made to the utility statute in 1946, the answer is clear. Samsung claims that, well, somehow the article of manufacture requires a portion. Well, the statute doesn't make the patent to design and the article of manufacture coextensive. It says that the patent design has been applied to the article of manufacture. And in Nike, the patent only covered a portion of the shoe. It didn't cover the bottom of the shoe. It's dotted line. Same in L.A. here. In Nike, though, it was the entire shoe that was the base. This is not the cup holder. The cup holder, a patent on the cup holder would be like the Young case where the patent was only on the last of the refrigerator. If there is a patent on the cup holder, then that's what you get, a cup holder. That's the article of manufacture. Here— What if it's a picture of a car and you can see the cup holder? Well, Your Honor, in order to infringe that, you have to have a design of a car with that cup holder. It would actually impose more limitations than what you did. But that's not the circumstance in the hypothetical which the court has considered before. The cup holder hypothetical we've dealt with before is very close to Young, which was just the last of the refrigerator. Ours is—and the court, the claim construction by Judge Koh said exactly this. Particularly for the first two design patents, the 677 and the 087, it was the appearance of the electronic device. Now, Samsung tried to pick things apart, but we've had this discussion with a portion of the panel before. It's as if the more intellectual property you have protecting the device, the worse you are. And that can't possibly be the result. And your time is up. Thank you, Your Honor. Thank you. We've got four minutes. Just a few points, Your Honor. If we could begin with design patents. I want to make clear an answer to Judge Chen's line of questioning, that we did offer the judge many ways to distinguish functional from ornamental. We did not just insist on a list. And if you look at our proposed instruction, you'll see that that's so. Second, we did not waive the claim construction argument. And Judge O'Malley, in answer to your question, it's preserved in our blue brief at page 22. And what we're really saying to you here, and the Constitution binds this court, not just the district court, is that you shouldn't overprotect design patents by allowing functional elements to be factored by the jury into a comparison between Apple's and Samsung's designs. All we ask is the chance for a jury to be told, where Apple has admitted that a number of features are functional, at the infringement stage, try to imagine what the hypothetical observer would do, separate the ornamental from the functional. So we accept that the judge could do it in many forms. She didn't do it at all, either a claim construction or an infringement. And in reviewing this court's cases, if you look just at the infringement cases on design patents, you've overwhelmingly declined to find infringement. Overwhelmingly. Crocs and LA gear are the only cases, both involving shoes, in which you actually upheld or insisted on an infringement verdict. And that's not surprising, because when you properly factor functional elements out, as should have been done here, then it's very difficult to say that the ornamental appearances only have been infringed. On the damages, I just would respectfully suggest that Nike, in which the apportionment discussion was dicta, which was about the marking statute, Nike is not dispositive on the issues we've raised here about Section 289. It can't be that the piano cases, as well as Young and Untermeyer and other cases, they were all responding to the notion. And by the way, I didn't suggest that Apple's things were absurd. I was trying to argue against an absurd interpretation of Section 289, and that's what the piano cases and Young and Untermeyer did. They said, we're not going to give entire profits on the refrigerator latch. We're not going to give entire profits on the piano, including the case. And as to the notion that the article of manufacture here is the whole phone, with respect, that's just not so. Different original equipment manufacturers make the glass and the chips and the other things that combine to the phone. There's a very healthy aftermarket for used phones, because glass and bezels and chips and other components can be disaggregated. The piano cases dissenting judge said, there's no separate market for piano cases, and the majority said, that doesn't matter. So with respect, we think you do have an opportunity to construe article of manufacture in a sensible way, especially relying on to the extent of, so as not to confer entire profits here. But if you have any doubt, please at least go back to liability. A copy that Apple gets to say, overall appearances are enough, and we get entire profits. On trade grants, I just want to be clear that the instruction was not waived under Ninth Circuit law. We put in our proposed instruction. The judge very clearly said, you don't need to repeat yourselves. Everything you've already put in your brief is preserved. And we proposed an instruction that she declined to give. So with respect, if you just focus on the instruction on willfulness for damages, we did preserve that. But we don't think you need to rely just on instructional error, because there was no proof of willfulness. And I want to be very clear. Mr. Lee spent a long time picking apart the language of our proposed instruction. He never argued with the fact that the core of it was absolutely correct and never given by the judge. The instruction needed to say that we were trading on recognition of the source. Not intent to copy, not intent to harm in the abstract, intent to trade on source recognition. That instruction was not given, and there was no evidence to support it. The survey evidence that Mr. Lee cites, we've covered it in our brief, but Mr. Poirier didn't ask about people in the general population. He asked people who already recognized the trade dress. So, Your Honor, with respect, we hope that you will reverse trade dress, read the section of our brief about utility patents, because that's a lot of money for it to be reversed to, and at least remand on design patents. And if you remand on design patents, we respectfully request that you allow our defendant to develop his evidence. Thank you. We have your argument. We thank both counsel for a helpful argument. That concludes our proceedings for this morning.